## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **NOUF AL-BAHAR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V** | ) | **CIVIL ACTION NO.** 24-cv-00682 |
| | ) | |
| **ANDREW LOCKHART AND** | ) | **JURY DEMANDED** |
| **BERKLAY AIR SERVICES** | ) | |
| **CORPORATION, d/b/a BERKLAY** | ) | |
| **SHIPPING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Nouf Al-Bahar ("Plaintiff") files this, her Original Complaint, complaining of Defendant Andrew Lockhart ("Defendant Lockhart") and Defendant Berklay Air Services Corporation, d/b/a Berklay Shipping ("Defendant Berklay"), and would respectfully show as follows:

### I.   INTRODUCTION

Plaintiff alleges that Defendants committed fraud resulting in Plaintiff's extraordinary loss of money and artwork. Plaintiff, who is a citizen of and resides in Kuwait, engaged the services of Defendant Lockhart to advise her regarding the location, purchase, acquisition, storage and shipping of numerous pieces of art. Defendant Lockhart then engaged Defendant Berklay, on Plaintiff's behalf, to handle the storage and shipping of some of those pieces. Despite Plaintiff paying Defendant Lockhart $381,975.00 and permitting some or all of the artwork to be stored with Defendant Berklay, nine of the art pieces allegedly procured by Defendant Lockhart that were to be stored and shipped by Defendant Lockhart and/or Defendant Berklay were never received by

Plaintiff ("Undelivered Art Pieces"). Plaintiff alleges that she reasonably relied on Defendants' misrepresentations regarding the purchase, acquisition, storage and/or shipment of Plaintiff's Undelivered Art Pieces and Plaintiff suffered damages in the loss of money and failure to receive the Undelivered Art Pieces.

## II.  PARTIES

1.      Plaintiff Nouf Al-Bahar is an individual and citizen of Kuwait.

2.      Defendant Andrew Lockhart is an individual and citizen of the State of New York who resides and may be served with process at 91 E. 3rd Street, Apt 8, New York, NY 10003-9028.

3.      Defendant Berklay Air Services Corporation, d/b/a Berklay Shipping, is a corporation that is incorporated under the laws of the State of New York. Defendant Berklay has its principal place of business in the State of New York at 14 Bond Street, Ste. 233, Great Neck, New York, 11021.

## III.  JURISDICTION AND VENUE

4.      The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(2) because the suit is between Defendants who are citizens of the state of New York and Plaintiff who is a citizen of Kuwait and not a lawfully admitted permanent U.S. resident domiciled in the state of New York, and the amount in controversy exceeds $75,000, excluding interest and costs because this lawsuit concerns undelivered artwork that was purchased for $381,975.00, and the present value likely exceeds that amount.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant Lockhart resides in this district and all Defendants reside in the state of New York.

6.      Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

7.      Lastly, venue may also be proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the property at issue may be situated in this district to the extent Defendants are still in possession of Plaintiff's Undelivered Art Pieces.

## IV.  SUMMARY OF ALLEGATIONS

8.      Defendant Lockhart, holding himself out to be an expert art advisor with professed knowledge as to certain contemporary artists, marketability of their artwork, valuation, etc., advised Plaintiff regarding the location, purchase, acquisition, storage and shipping of fifteen pieces of art beginning in June of 2014.

9.      Defendant Lockhart engaged Defendant Berklay, on Plaintiff's behalf, to store and/or ship some of the art pieces.

10.     Of the fifteen art pieces, six were successfully shipped to Plaintiff and nine (the "Undelivered Art Pieces") were not.

11.     The following provides a list of the six delivered art pieces, their date and amount of purchase, payment recipient and designated storage/shipper:

| No. | Date of Payment | Description | Amount | Payment Recipient | Shipper |
|---|---|---|---|---|---|
| 1 | 8-Jan-15 | Jose Parla (Via Massa, Albissola) | $135,000.00 | Defendant Lockhart Bank of America Account # x750 | Arrived from United Kingdom via Flight Logistics in December 2015 |
| 2 | On/around 2016 | KAWS (Obliterate) | $200,000.00 | Direct payment to New York Gallery LLC | Arrived from United States "The Concept Company Ltd." in July 2016 |
| 3 | 27-Apr-15 | Jose Parla (Invader Mario) | $70,642.00 | Defendant Lockhart Bank of America Account # x750 | Arrived from United Kingdom via |

| | | | | | Flight Logistics in Dec 2015 |
|---|---|---|---|---|---|
| 4 | 18-Jun-15 | Barry X Ball (Purity) | $250,000.00 | Direct payment to Barry X Ball Studio | Arrived from United States via Masterpiece International in November 2015 |
| 5-6 | 6-Aug-14 | Daniel Arsham (Guitars, 2 works) | $60,000.00 | Defendant Lockhart Bank of America Account # x750 | Arrived from United States via Transcrate Logistics in March 2018 |
| | | | $715,642.00 | | |

12.     Defendant Lockhart's role was to advise Plaintiff regarding her purchases, obtain the art, and then coordinate the storage of the artwork and ultimate shipment to Plaintiff in Kuwait.

13.     Defendant Berklay's role was to store and ship some of the Undelivered Art Pieces.

14.     As with much of the delivered artwork, Defendant Lockhart advised Plaintiff to directly pay him $381,975.00 to acquire the Undelivered Art Pieces on her behalf and provide them to her.

15.     The following provides a list of the Undelivered Art Pieces at issue in this litigation, their purchase date and price, payment recipient, and designated storage/shipper:

| No. | Date of Payment | Description | Amount | Payment Recipient | Storage/ Shipper |
|---|---|---|---|---|---|
| 1 | 12-Jun-14 | Pryce Lee Work (Innocent Bystander) | $18,000.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Berklay |
| 2 | 6-Nov-14 | Pryce Lee (Untitled, 2014, Street Hieroglyphics Series) | $8,000.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Berklay |

| 3 | 11-Dec-14 | Michael Staniak (Data_987) | $26,500.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Berklay |
| 4 | 8-Jan-15 | Jose Parla (Center Street) | $57,500.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Berklay |
| 5 | 15-Apr-15 | Murakami (TBC 2015 # 32755) | $180,000.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Berklay |
| 6 | 13-Apr-15 | James Austin Murray (A Strange Mix of Everyone) | $19,975.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Berklay |
| 7 | 13-May-15 | Freddy Tuppen (VHS Tape Painting) | $6,000.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Lockhart |
| 8 | 13-May-15 | Gregory Theilker (Indefinite Struggle) | $7,500.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Lockhart |
| 9 | 31-May-15 | Guillaume Leblon (The Innocents Coat) | $58,500.00 | Defendant Lockhart Bank of America Account # x750 | Defendant Lockhart |
| | | | $381,975.00 | | |

16.     Plaintiff alleges that Defendant Lockhart misrepresented on numerous occasions that he would purchase, acquire, store and ship Plaintiff's Undelivered Art Pieces on her behalf and Defendant Berklay misrepresented on numerous occasions that it would store and ship Plaintiff's Undelivered Art Pieces on her behalf.

17.     Despite Defendants' promises and representations regarding the storage and delivery of the Undelivered Art Pieces, Plaintiff has never received them due to the fraud perpetuated by Defendants.

18.     Through a prolonged series of interactions lasting several years, Plaintiff alleges that Defendants perpetuated their fraud by: a) causing unreasonable delay; b) claiming illegitimate

storage fees; and c) continually pointing the finger at each other in a shell game designed to avoid responsibility, detection, and remedial action by Plaintiff.

## A.  UNREASONABLE DELAY

19.     In furtherance of their fraudulent promises to store and ship Plaintiff's Undelivered Art Pieces, Plaintiff alleges that Defendant Lockhart and/or Defendant Berklay continually created unreasonable shipping delays. Plaintiff alleges that Defendants repeatedly communicated and falsely represented to Plaintiff that they would ship the Undelivered Art Pieces, but each communication pushed the shipment dates further and further back. *See e.g.*, February 29, 2016 (Defendant Lockhart stated that though the artwork was stored with Defendant Berklay, he would ship with Flight Logistics instead); December 5, 2016 (Defendant Lockhart stated he would work with Defendant Berklay again to ship - instead of Flight Logistics - because the works were stored with Defendant Berklay). In all of these instances, Defendant Lockhart and/or Defendant Berklay delayed the shipment of Plaintiff's Undelivered Art Pieces.

20.     Plaintiff alleges that Defendant Lockhart and/or Defendant Berklay created additional delays when Plaintiff tried to change the storage location and shipper for the Undelivered Art Pieces to expedite shipping and Defendants failed to work with the new shipper. *See e.g.*,  March 26, 2017 and March 29, 2017 (Defendant Berklay refused to release until storage fees paid); March 26, 2017 (Defendant Lockhart agreed to work with new shipper but then failed to do so); August 28, 2017 (Defendants failed to work with new shipper); August 31, 2017 (Defendant Lockhart stated he would talk to new shipper so that works stored in his apartment could be shipped but did not); September 18, 2017 (Defendant Lockhart continually fails to work with new shipper); September 28, 2017 (Defendant Lockhart blamed shipping delays on being out of town and offered to work with new shipper the following week); October 18, 2017 (new shipper

tried to contact Defendant Lockhart but was not been able to reach him); October 21, 2017 (Defendant Lockhart failed to work with new shipper); October 24, 2017 (new shipper was still waiting to hear from Defendant Lockhart regarding the pick-up date); May 14, 2018 (Defendant Lockhart again failed to work with new shipper). Despite Plaintiff's consistent efforts, Plaintiff alleges that Defendants caused continual unreasonable delays in the shipment of the Undelivered Art Pieces to support their fraudulent promises to store and/or ship Plaintiff's Undelivered Art Pieces.

### B.  ILLEGITIMATE STORAGE FEES AND REFUSAL TO DELIVER

21.     Additionally, Plaintiff alleges that Defendants perpetuated their fraud by refusing to deliver the Undelivered Art Pieces despite having them in their possession. Defendant Berklay repeatedly refused to release the Undelivered Art Pieces until self-inflated storage fees were paid. (*See* e.g., March 26, 2017; March 29, 2017; April 2, 2017; April 13, 2017 below). The vast amount of storage fees demanded by Defendant Berklay were the result of the Defendants' unreasonable delays combined with their shell game regarding possession of, and responsibility for, the Undelivered Art Pieces.  While refusing to ship, Defendant Berklay also went so far as to demand storage fees. Defendant Berklay concurrently threatened to deem the artwork abandoned, despite Plaintiff's continual attempts to seek the delivery of the Undelivered Art Pieces. *See e.g.*, April 2, 2017; April 13, 2017 (Plaintiff seeks delivery but Defendant Berklay refuses to release any work until storage fees are paid); February 14, 2018 ("Your artwork was picked up, crated, and stored now for over 3 years.  If you do not have any need for this work, we will go to court as of MARCH 1, and claim these goods as ABANDONED.")

22.     Plaintiff alleges that Defendant Berklay refused to ship Plaintiff's Undelivered Art Pieces while also claiming it would consider them abandoned (and while demanding storage fees,

denying knowledge of storage crate contents and blaming the loss of the some of the pieces on Defendant Lockhart, as discussed in Section C below).

23.     Plaintiff alleges that Defendants' refusals to deliver were in support of their fraudulent scheme to obtain Plaintiff's money and Undelivered Art Pieces and that they never intended to provide the Undelivered Art Pieces to Plaintiff.

### C.  SHELL GAME OF SHIFTING RESPONSIBILITY

24.     Lastly, Plaintiff alleges that Defendants created a shell game of shifting the responsibility for the loss and failure to ship of some of the artwork and shipment failures by pointing the finger at each other. Plaintiff was introduced to Defendant Berklay by Defendant Lockhart reflecting Defendants' prior relationship. While Defendant Lockhart initially stated, "most of works now were in his flat" (*See* May 24, 2016, communications below), Defendants later agreed to move and store some of the Undelivered Art Pieces with Defendant Berklay and confirmed that all of the works were "accounted for" between Defendants. (*See* February 27, 2017, communications below). During that time, Defendants never represented that any of the works were missing.

25.     However, this story changed and Defendants began to hide the ball as to the location of certain art pieces as Plaintiff's efforts to obtain the Undelivered Art Pieces intensified. Defendant Lockhart alleged that Defendant Berklay lost the art while Defendant Berklay claimed that it was Defendant Lockhart who was responsible instead. *See e.g.*, March 17, 2017, (Defendant Lockhart stated for the first time "there is one crate that [Defendant Berklay] has to locate." Defendant Berklay responded to Defendant Lockhart and stated, "No clue on what is exactly inside" the crated works); April 13, 2017, (Defendant Lockhart stated the James Austin Murray work (A Strange Mix of Everyone) "is being located" "and when that work is found we can ship

it. . . [Defendant Berklay] insisting that full payment be made prior to the release of any work").

26.    Defendants continually blamed each other for the loss of some of the artwork. *See e.g.*, April 24, 2017, (Defendant Lockhart stated Defendant Berklay picked up the stored works and the missing James Austin Murray work from Defendant Lockhart's flat and that Defendant Berklay needed to locate the work. Defendant Lockhart stated Defendant Berklay had lost the work and Defendant Berklay claimed they had no documentation but that Defendant Lockhart could come and look for the missing work); February 15, 2018, (Defendant Berklay responded to Defendant Lockhart (and copied Plaintiff's assistant) and stated they were not aware of any lost items and that Defendant Lockhart should come to the warehouse to look at the inventory); February 15, 2018, (Defendants communicated with each other (copying Plaintiff's assistant and agent and Plaintiff) summarizing the situation and Defendant Lockhart asked Defendant Berklay to release the remaining works while Defendant Berklay invited Defendant Lockhart to come look for Plaintiff's (two missing) works at the warehouse).

27.    This shell game of hiding the art and shifting blame continued even as late as September 14, 2023, when Plaintiff's Counsel received an email from Defendant Berklay that "All items deposited in our warehouse by Mr. Lockhart have been returned to Mr. Lockhart."

28.    Plaintiff alleges that Defendants pointed to and blamed each other for the delays in shipment and the mounting storage fees incurred due to same. *See e.g.*, March 9, 2017, (Defendant Lockhart stated (copying Defendant Berklay) that shipment had not yet occurred because Defendant Berklay was finalizing the shipment paperwork and that the works had been inventoried again); April 13, 2017, (Defendant Lockhart blamed Defendant Berklay for the delays and stated he had an issue with paying the storage fees); May 10, 2017, (Defendant Lockhart requested that Defendant Berklay assist with resolving shipping issues); May 16, 2017, (Defendant Lockhart

emailed regarding lack of response from Defendant Berklay).

29.      Plaintiff alleges that Defendant Lockhart misrepresented that he would purchase, acquire, store and ship Plaintiff's Undelivered Art Pieces on her behalf and Defendant Berklay misrepresented that it would store and ship Plaintiff's Undelivered Art Pieces on her behalf and that Defendants utilized the above-referenced tactics of delay, refusal to deliver, and blame-shifting in furtherance of same. Defendants' actions present the classic properties of a concerted scheme to defraud Plaintiff of her right to possess the Undelivered Art Pieces for which Plaintiff paid.

30.      Plaintiff alleges that Defendants knew these promises were false and that they did not intend to provide the Undelivered Art Pieces to Plaintiff. Plaintiff alleges that Defendants intended to defraud Plaintiff by taking her money without providing the Undelivered Art Pieces and/or by retaining the Undelivered Art Pieces. Plaintiff alleges that based on their past successful dealings, Plaintiff reasonably relied on Defendant Lockhart's false statements to purchase, acquire, (and engage Defendant Berklay) to store and ship Plaintiff's Undelivered Art Pieces on her behalf and paid Defendant Lockhart $381,975. Plaintiff alleges that based on Defendant Lockhart's relationship and past dealings with Defendant Berklay, Plaintiff reasonably relied on Defendant Berklay's agreement to store and ship Plaintiff's Undelivered Art Pieces on her behalf and permitted Defendant Berklay to take possession of the Undelivered Art Pieces for storage prior to its shipment of same.

31.      Plaintiff reasonably relied on Defendants' false statements and provided payments to and/or permitted the Undelivered Art Pieces to be stored with Defendants. Defendants have failed to provide the Undelivered Art Pieces to Plaintiff.  Plaintiff has suffered damages in the loss of money and failure to receive the Undelivered Art Pieces which may have increased in value.

### V.  FACTS

*A.     Background*

32.     Plaintiff and Defendant Lockhart met in 2013 or 2014 and he offered to assist Plaintiff in locating various works of art.

33.     On or about June 11, 2014, Defendant Lockhart provided his personal bank account information to Plaintiff and requested the wiring of $18,000 for the Pryce Lee Work (Innocent Bystander) and provided that he would arrange for the shipping to Plaintiff.

34.     On or about June 12, 2014, Plaintiff's assistant confirmed the transfer of $18,000 as requested for the Pryce Lee (Innocent Bystander) work.

35.     On or about July 8, 2014, Defendant Lockhart confirmed he had received the $18,000 for the Pryce Lee (Innocent Bystander) work and "the funds have arrived to my account and have since been transferred to the artist. . . we will be arranging the shipping in a few days once the work has been cleaned and proper crating has been secured. I will coordinate an email between you and the shipper at that time."

36.     On or about November 6, 2014, Defendant Lockhart sent Plaintiff's assistant an $8,000 invoice for an additional Pryce Lee work (Untitled, 2014, Street Hieroglyphics Series). Plaintiff's assistant responded that the payment had already been sent and attached a copy of the bank transfer to Plaintiff's personal bank account.

37.     On or about June 22, 2015, Defendant Lockhart stated "Also, all of the other works here in the U.S will be rounded up this week and prepared for shipping. They are Pryce Lee - Innocent Bystander, Pryce Lee - Street Hieroglyphics, Michael Staniak, Daniel Arsham – Guitars, Murakami - Enso Painting, Kaws – Obliterate, James Austin Murray . . . I'll get you the estimates on all of these once they are all collected by the shipper on Tuesday and we can go from there."

38.     On or about November 12, 2015, Defendant Lockhart confirmed receipt of the $8,000 payment for the additional Pryce Lee (Untitled, 2014, Street Hieroglyphics Series) work.

39.     On or about December 9, 2014, Plaintiff's assistant stated she would send Defendant Lockhart $26,500 (to his personal bank account) in response to Defendant Lockhart's invoice for the Michael Staniak (Data_987) artwork.

40.     On or about December 15, 2014, Defendant Lockhart confirmed receipt of the $26,500 payment for the Michael Staniak (Data_987) piece.

41.     On or about January 8, 2015, Defendant Lockhart sent Plaintiff's assistant an invoice for $57,500 for the Jose Parla (Center Street) work, which Plaintiff's assistant paid to Defendant Lockhart's personal bank account.

42.     On or about April 9, 2015, Plaintiff's assistant stated she would prepare to transfer funds in response to Defendant Lockhart's $180,000 invoice for the Murakami (TBC 2015 #32755) work to his personal bank account.

43.     On or about April 19, 2015, Defendant Lockhart stated that he had received the funds for the Murakami (TBC 2015 #32755) work.

44.     On or about May 13, 2015, Plaintiff's assistant stated she had sent $13,500 for the Freddy Tuppen (VHS Tape Painting) and Gregory Theilker (Indefinite Struggle) works to Defendant Lockhart's personal bank account.

45.     On or about May 18, 2015, Defendant Lockhart responded that the Tuppen (VHS Tape Painting) and Theilker (Indefinite Struggle) payments had been received.

46.     On or about May 31, 2015, Plaintiff's assistant stated she had transferred $58,500 for the Guillaume Leblon (The Innocents Coat) work to his personal bank account.

47.     On or about June 3, 2015, Defendant Lockhart responded that he had received the

funds for the Leblon (The Innocents Coat) work.

48.    On or about June 8, 2015, Plaintiff's assistant and Defendant Lockhart communicated regarding the $250,000 direct wire transfer to artist Barry X Ball for the Purity artwork.

49.    On or about June 22, 2015, Defendant Lockhart stated that the $250,000 wire was incoming for the Ball (Purity) work.

50.    On or about July 29, 2015, Lockhart confirmed the shipping costs on the Jose Parla (Via Massa, Albissola and Invader Mario) works from London to Kuwait City.

51.    On or about August 3, 2015, Defendant Lockhart and Plaintiff's assistant exchanged emails regarding the shipping of the Barry X Ball (Purity) work and crating and re-crating of other works. Defendant Lockhart stated that the "Invader and one of the Jose Parlas will ship differently.  I will put you in touch with that shipper directly now."

52.    On or about August 3, 2015, Defendant Lockhart connects Plaintiff's assistant with Defendant Berklay by email in response to Plaintiff's assistant's request related to the insurance of Plaintiff's unshipped artwork.

53.    On or about August 5, 2015, Defendant Lockhart forwarded Plaintiff's assistant (and copied Dennis Klainberg, President of Defendant Berklay) the invoices for the following works to be shipped by Defendant Berklay: Daniel Arsham (Guitars), James Austin Murray (A Strange Mix of Everywhere), Murakami (TBC 2015 #32755), Jose Parla (Center Street), Pryce Lee (Untitled, 2014 Street Hieroglyphics Series) and Michael Staniak (Data_987). Defendant Lockhart stated he was waiting on the Pryce Lee (Innocent Bystander) work and asked for confirmation from Defendant Berkeley that the works would be shipped at the same time.

54.    On or about August 6, 2015, Defendant Lockhart emailed Plaintiff's assistant and

shipper Flight Logistics Group Limited regarding the shipment of Invader (Mario Tse Doung) and Jose Parla (Via Massa, Albissola) works.

55.     On or about September 2, 2015, Plaintiff's assistant emailed Defendants for an update on status of shipment to be shipped by Defendant Berklay.

56.     On or about September 7, 2015, Defendant Lockhart emailed Plaintiff's assistant and confirmed "all is secure and just waiting on Nouf with Dennis (the shipper) [Defendant Berklay]."

57.     On or about September 11, 2015, Defendant Lockhart told Plaintiff's assistant that he had spoken to Defendant Berklay about the shipping of the undelivered works and that Defendant Lockhart would head to JFK Airport the following week for a final walkthrough so that Defendant Berklay could be in touch regarding insurance.

58.     On or about October 5, 2015, Defendant Lockhart confirmed with Plaintiff's assistant that the following works would be in one consolidated shipment from Defendant Berklay that will be "shipped forthwith":

1.   Daniel Arsham (Guitars (2))
2.   James Austin Murray (A Strange Mix of Everything)
3.   Murakami (TBC 2015 #32755)
4.   Jose Parla (Center Street)
5.   Pryce Lee (Innocent Bystander)
6.   Pryce Lee (Untitled, 2014, Street Hieroglyphics Series)
7.   Michael Staniak (Data_987)

59.     On or about November and December, 2015, Plaintiff received Jose Parla (Invader Mario) from Flight Logistics (UK) and Barry X Ball (Purity) from Masterpiece International (not Defendant Berklay).

60.     On or about January 31, 2016, Plaintiff's assistant followed up with Defendant Lockhart and Defendant Berklay regarding the status of the consolidated shipment.

61.    On or about February 4, 2016, Lockhart provided the invoice for Kaws (Obliterate) ($200,000) and stated it would be shipped through Steve Moxon-Riedlin at Flight Logistics and that there was no need to confer with Defendant Berklay any longer regarding this shipment.

62.    On or about February 16, 2016, Plaintiff's assistant followed up with Defendants regarding the status of Plaintiff's shipments.

63.    On or about February 29, 2016, Defendant Lockhart emailed Plaintiff's assistant and Steve Moxon-Riedlin at Flight Logistics Group and provided that the Kaws (Obliterate) work held by Gander and White in Miami had additional crating and packing charges ($620) and that he had the works with Defendant Berklay sent to Defendant Lockhart's flat because he intended to now use Steve Moxon-Riedlin at Flight Logistics to handle the shipping instead.

64.    On or about April 10, 2016, Defendant Lockhart followed up with Steve Moxon-Riedlin and copied Plaintiff's assistants regarding the status of the works that needed to be collected from Defendant Berklay.  Plaintiff's assistant also inquired about Defendant Lockhart's discontinued use of Defendant Berklay.  Defendant Lockhart stated he was not using Berklay because Berklay misplaced another one of his client's work. Defendant Lockhart also stated the Kaws (Obliterate) work from Gander and White needed to be shipped as well.

65.    On or about May 24, 2016, in response to Plaintiff's assistant's email requesting a follow-up, Defendant Lockhart emailed Steve Moxon-Riedlin and Plaintiff's assistant and stated that now most of Plaintiff's works were in Defendant Lockhart's flat and that he would arrange transport for them as well as the one work in Miami with Steve Moxon-Riedlin.

66.    On or about May 26, 2016, in response to Plaintiff's assistant's email requesting a follow-up, Defendant Lockhart emailed Steve Moxon-Riedlin and Plaintiff's assistant and stated the works should be ready for shipping within the week. Defendant Lockhart stated he would give

Steve Moxon-Riedlin dimensions for estimates on shipping costs.

67.     On or about June 16, 2016, Plaintiff's assistant followed up with Defendant Lockhart and Steve Moxon-Riedlin regarding the status of the shipments and the need for the values of each shipment for insurance purposes.

68.     On or about June 19, 2016, Defendant Lockhart followed-up with Steve Moxon-Riedlin and Plaintiff's assistants to finalize the shipment of the works with Flight Logistics:

1.  Daniel Arsham (Guitars (2)) (Defendant Lockhart stated these were stored at his "flat") ($60,000)

2.  James Austin Murray (A Strange Mix of Everywhere) (Defendant Lockhart stated this was stored with Defendant Berklay) ($23,500)

3.  Murakami ("TBC" 2015 #32755) (Defendant Lockhart stated this was stored with Defendant Berklay) ($200,000)

4.  Jose Parla (Center Street) (Defendant Lockhart stated this was stored with Defendant Berklay) ($57,500)

5.  Pryce Lee (Innocent Bystander) (Defendant Lockhart stated this was stored with Defendant Berklay) ($18,000)

6.  Pryce Lee (Untitled, 2014, Street Hieroglyphics Series) (Defendant Lockhart stated this was stored with Defendant Berklay) ($8,000)

7.  Michael Staniak (Data_987) (Defendant Lockhart stated this was stored with Defendant Berklay) ($26,500)

Defendant Lockhart included invoices and stated he visited Defendant Berklay a couple of weeks prior and confirmed all the works were there.

69.     On or about June 26, 2016, Defendant Lockhart emailed Plaintiff's assistant and Steve Moxon-Riedlin that he was going to Defendant Berklay's location on July 5, 2016 to prepare the art for shipping with Flight Logistics.

70.     On or about June 27, 2016, Plaintiff's assistant asked Defendant Lockhart to "please speed up the process to expedite the shipments."

71.     On or about July 5, 2016, John Hatch, with Gander and White, emailed Plaintiff's assistants, Steve Moxon-Riedlin, and Defendant Lockhart to arrange for DHL to pick up Kaws (Obliterate) for transport (to Kuwait).

72.     On or about July 11, 2016, Defendants emailed Plaintiff's assistant and Steve Moxon-Riedlin regarding Plaintiff's works stored with Defendant Berklay that were to be transferred to Steve Moxon-Riedlin for shipment the following week, and Defendant Berklay confirmed "ok."

73.     On or about August 7, 2016, Defendant Lockhart emailed Steve Moxon-Riedlin and Plaintiff's assistants regarding the use of a box truck to pick up the artwork from Defendant Berklay, and Defendant Lockhart stated he was covered by art insurance.

74.     On or about September 2, 2016, in response to Plaintiff's assistant's request for an update, Defendant Lockhart (copied Defendant Berklay and Steve Moxon-Riedlin) and represented that he would meet with Defendant Berklay on September 6, 2016 to review getting the undelivered works shipped.

75.     On or about September 6, 2016, Defendant Berklay emailed Defendant Lockhart, Plaintiff's assistant, and Steve Moxon-Riedlin and stated he had not heard from Defendant Lockhart that day and was not available the rest of the day but could meet the following morning.

76.     On or about September 6, 2016, Defendant Lockhart responded to Defendant Berklay, Plaintiff's assistant and Steve Moxon-Riedlin and stated he was available on September 8, 2016.

77.     On or about September 25, 2016, Plaintiff's assistant followed up with Defendants (and copied Steve Moxon-Riedlin) regarding the status of the shipment from Defendant Berklay.

78.     On or about September 28, 2016, Defendant Berklay responded to Plaintiff's

assistant's email regarding the status of the shipment from Defendant Berklay and asked Defendant Lockhart to "Please advise!" regarding their plan to meet to discuss shipment.

79.     On or about October 10, 2016, Plaintiff's assistant followed up with Defendants (and copied Steve Moxon-Riedlin) regarding the status of the shipment from Defendant Berklay.

80.     On or about October 12, 2016, Defendant Lockhart responded to Plaintiff's assistant, (and copied Defendant Berklay and Steve Moxon-Riedlin) and stated he would collect the works from Defendant Berklay that week.

81.     On or about October 24, 2016, Plaintiff's assistant followed up with Defendants (and copied Steve Moxon-Riedlin) regarding the status of the shipment from Defendant Berklay.

82.     On or about October 31, 2016, Defendant Lockhart responded to Plaintiff's assistant (copied Defendant Berklay and Steve Moxon-Riedlin) and stated he would collect the works from Defendant Berklay in three days.

83.     On or about November 15, 2016, Plaintiff's assistant followed up with Defendants (and copied Steve Moxon-Riedlin) regarding the status of the shipment from Defendant Berklay.

84.     On or about November 30, 2016, Plaintiff's assistant followed up again with Defendants (and copied Steve Moxon-Riedlin) regarding the status of the shipment from Defendant Berklay.

85.     On or about December 5, 2016, Defendant Lockhart responded to Plaintiff's assistant and stated he just got back from Miami Art Basel and would use Defendant Berklay instead of Steve Moxon-Riedlin with Flight Logistics because the work had been stored with Defendant Berklay for some time. Defendant Lockhart stated he would work with Defendant Berklay once Defendant Berklay returned from Miami.

86.     On or about January 9, 2017, Defendant Berklay stated he was "Standing ready!"

in response to Plaintiff's assistant's email asking Defendant Lockhart for the status of the shipment of the artworks.

87.     On or about January 10, 2017, in response to Plaintiff's assistant's email asking Defendant Lockhart for the status of the shipment of the works, Defendant Lockhart stated he "definitely dropped the ball towards the end of the year" but would meet with Defendant Berklay the next week to complete the shipment in January.

88.     On or about January 10, 2017, Defendant Berklay responded to Defendant Lockhart and Plaintiff's assistant that he was available January 20, 2017, to prepare the artwork for shipment.

89.     On or about February 6, 2017, Defendant Lockhart emailed Defendant Berklay and Plaintiff's assistant and asked if Defendant Berklay could finalize the shipment with him on February 9, 2017.

90.     On or about February 14, 2017, Plaintiff's assistant emailed Defendant Lockhart and stated it had been more than two years since the art was paid in full and they had not been shipped and stated if they were not delivered within the month, Plaintiff would demand a refund for the non-delivered works.

91.     On or about February 14, 2017, Defendant Lockhart responded to Plaintiff's assistant that he was planning to finalize everything and would get everything shipped by month's end and "that the works in question are all stored safely."

92.     On or about February 15, 2017, Defendant Lockhart related to Plaintiff's assistant that he planned to meet with the shipper in the next week to ship Plaintiff's works the next weekend or early the following week.

93.     On or about February 22, 2017, Plaintiff's assistant emailed Defendant Lockhart

regarding the status of the shipments.

94.     On or about February 23, 2017, Defendant Lockhart responded to Plaintiff and Plaintiff's assistant that he did a walk through with Defendant Berklay and confirmed all the works were there, except for Daniel Arsham (Guitar, 2), Freddy Tuppen (VHS Tape Painting) and Gregory Thielker (Indefinite Struggle) which were stored at Defendant Lockhart's apartment and the Guillaume Leblon (Innocents Coat) which Defendant Lockhart stated was with the gallery. Defendant Lockhart stated he and Defendant Berklay would have the remaining works collected that week and shipped.

95.     On or about February 27, 2017, Defendant Lockhart updated Plaintiff's assistant that the works with Defendant Berklay had been accounted for and were ready to be shipped, the works in his flat were with the gallery were ready to be collected and that he would arrange for collection and transport to Defendant Berklay this week. Defendant Lockhart stated he would be finalizing shipping with Defendant Berklay the next week.

96.     On or about March 1 and 5, 2017, Plaintiff's assistant followed up with Defendant Lockhart and expressed frustration with the lack of shipment.

97.     On or about March 4, 2017, Defendant Lockhart updated Plaintiff and her assistant that the works in his flat were ready to be collected on March 8, 2017, and shipped "immediately after."

98.     On or about March 9, 2017, Plaintiff's assistant followed up with Defendant Lockhart again regarding the shipments and Defendant Lockhart responded (copying Defendant Berklay) and stated that Defendant Berklay was finalizing the shipment paperwork and that the works had been inventoried again.

99.     On or about March 15, 2017, in response to Plaintiff's assistant's request for an

update, Defendant Lockhart updated Plaintiff's assistant stating that that he just received the estimate and would send the estimate that evening.

100.     On or about March 17, 2017, Defendant Lockhart emailed Defendant Berklay and copied Plaintiff's assistant asking Defendant Berklay to identify which crates had which art and that he knew "there is one crate that [Defendant Berklay] has to locate." Defendant Lockhart attached an estimate for crating and storage and air freight costs for $7,912.60 from Defendant Berklay.

101.     On or about March 17, 2017, Defendant Berklay responded to Defendant Lockhart and copied Plaintiff's assistant and stated, "No clue on what is exactly inside." Defendant Berklay requested additional information in preparation for shipping.

102.     On or about March 20, 2017, in response to Plaintiff's assistant's email that requested a status update and also requested that the storage fee be waived due to the storage costs accruing because of Defendant Lockhart's delay, Defendant Lockhart followed up with Defendant Berklay and copied Plaintiff and Plaintiff's assistant regarding status.

103.     On or about March 26, 2017, Plaintiff communicated to her assistant that she would like her cousin's shipping company (Transcrate) to take over. On the same date, Plaintiff's assistant emailed Mr. Fernandes at Transcrate and asked, per their phone call, that he arrange for shipping of the artwork, and sent him the list of art and corresponding invoices.

104.     On or about March 26, 2017, Defendant Lockhart responded to Plaintiff's assistant (and copied Defendant Berklay and Mr. Fernandes at Transcrate) and stated that once he was contacted by Transcrate, he would coordinate everything to get the shipment collected by the Transcrate team.

105.     On or about March 26, 2017, Defendant Berklay responded to Plaintiff's assistant

and Defendant Lockhart (and copied Mr. Fernandes at Transcrate) and stated that they could not accommodate Mr. Fernandes that day and the shipment would not be released until payments were settled.

106.    On or about March 29, 2017, Plaintiff's assistant followed up with Defendants (and copied Plaintiff and Mr. Fernandes at Transcrate) regarding the invoice for packing/crating and asserted that Defendant Lockhart must cover the outstanding storage costs.

107.    On or about March 29, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Plaintiff, Defendant Berklay and Mr. Fernandes at Transcrate) regarding Defendant Berklay who would not release the shipment until the storage, pickup, crating and turnover costs were settled. Plaintiff's assistant stated that Plaintiff would cover crating only, but not storage charges related to Defendants' delays.

108.    On or about April 2, 2017, Plaintiff's assistant followed up with Defendant Lockhart again (and copied Plaintiff and Mr. Fernandes at Transcrate) regarding the art in Defendant Lockhart's possession and Defendant Berklay who would not release shipment until storage, pickup, crating, and turnover were settled.  Plaintiff's assistant again stated that Plaintiff would cover crating only, but not charges related to the delays. She asked Defendant Lockhart to arrange and settle with Defendant Berklay or her legal department would handle.

109.    On or about April 13, 2017, Plaintiff's assistant followed up with Mr. Fernandes at Transcrate regarding his assistance in picking up the artwork.

110.    On or about April 13, 2017, Defendant Lockhart responded to Plaintiff's assistant (and copied Plaintiff, her assistants, Mr. Fernandes and Defendant Berklay) and stated he had spoken to Plaintiff's contact Mr. Samir Shah, a New York-based employee of international shipping company *Earth Relocation*,  and that the James Austin Murray work "is being located"

"and when that work is found we can ship it. . . [Defendant Berklay] insisting that full payment be made prior to the release of any work." Defendant Lockhart blamed Defendant Berklay for the delays and stated he had an issue with paying the storage fees.

111.    On or about April 19, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Plaintiff, Defendant Berklay and Mr. Fernandes at Transcrate) regarding the art shipment update and to confirm the deadline of April 19, 2017 to complete shipment.

112.    On or about April 23, 2017, Plaintiff's assistant followed up with Defendant Lockhart again (and copied Plaintiff, Defendant Berklay and Mr. Fernandes at Transcrate) regarding resolving issues with Defendant Berklay, the art shipment update, and the deadline of April 19, 2017 to complete shipment.

113.    On or about April 24, 2017, Defendants exchanged emails regarding potential loss of some of the artwork. Defendant Lockhart stated Defendant Berklay picked up the stored works and the missing James Austin Murray (A Strange Mix of Everyone) work from Defendant Lockhart's flat and that Defendant Berklay needed to locate the work. Defendant Lockhart stated Defendant Berklay had lost the work and Defendant Berklay claimed they had no documentation but that Defendant Lockhart could come and look for the missing work.

114.    On or about April 24, 2017, Defendant Lockhart responded to Plaintiff's assistant (and copied Plaintiff) regarding communications with Defendant Berklay and the status of the shipment.

115.    On or about May 1, 2017, Plaintiff's assistant followed up with Defendant Lockhart again (and copied Plaintiff) regarding the release by Defendant Berklay of the artwork ready for shipment and the location of the missing work.

116.    On or about May 10, 2017, Plaintiff's assistant followed up with Defendant

Lockhart again (and copied Plaintiff and Mr. Fernandes) regarding the lack of an update.

117.    On or about May 10, 2017, Defendants and Plaintiff's assistant exchanged emails regarding the missing Murray (A Strange Mix of Everyone) work and the cause of delays in shipment and Defendant Lockhart requested that Defendant Berklay assist with resolving shipping issues. On the same date, Defendants and Plaintiff's assistant exchanged emails regarding shipping issues and necessity "to file a legal action. . . to move ahead."

118.    On or about May 16, 2017, Defendant Lockhart and Plaintiff's assistant exchanged emails regarding the lack of response from Defendant Berklay.

119.    On or about July 31, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Plaintiff) regarding notification from Transcrate that they had obtained some artwork from Defendant Lockhart. Plaintiff's assistant asked Defendant Lockhart for identification of the artwork and if any remained in his possession.

120.    On or about August 1, 2017, Plaintiff's assistant communicated with Tony Fernandes from Transcrate regarding collection of the two Arsham (Guitars) pieces from Defendant Lockhart and the storage and shipment of same.

121.    On or about August 3, 2017, Plaintiff's assistant followed up with Tony Fernandes from Transcrate regarding the collection of the two Arsham (Guitars) pieces and the shipment of those pieces.

122.    On or about August 8, 2017, Plaintiff's assistant communicated with Defendant Lockhart and Tony Fernandes from Transcrate regarding the shipment status of the two Arsham (Guitars) pieces.

123.    On or about August 8, 2017, Plaintiff's assistant communicated with Defendant Lockhart and Tony Fernandes from Transcrate regarding the shipment status of the two Arsham

(Guitars) pieces and asked if Freddy Tuppen (VHS Tape Painting), Gregory Thielker (Indefinite Struggle) and the Guillaume Leblon (Innocents Coat) could also be collected and shipped because they were not stored with Defendant Berklay.

124.    On or about August 13, 2017, Plaintiff's assistant communicated with Tony Fernandes from Transcrate (and copied Defendant Lockhart) regarding the pickup of the two Arsham (Guitars) pieces and the remaining pieces stored with Defendant Lockhart that need to be picked up (Tuppen, Theilker and Leblon).

125.    On or about August 24 and 28, 2017, Plaintiff's assistant communicated with Defendant Lockhart and Tony Fernandes from Transcrate regarding the status of the works remaining with Defendant Lockhart and not stored with Defendant Berklay.

126.    On or about August 28, 2017, Plaintiff's assistant followed up with Tony Fernandes regarding the status of collecting the remaining works stored with Defendant Lockhart.

127.    On or about August 31, 2017, Plaintiff's assistant communicated with Defendant Lockhart and Tony Fernandes regarding the status of collecting the remaining works stored with Defendant Lockhart. Defendant Lockhart stated he would talk to Tony Fernandes in the next couple days regarding the final works to be picked up.

128.    On or about September 6, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart.

129.    On or about September 7, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart.

130.    On or about September 18, 2017, Plaintiff's assistant reached out to Defendant

Lockhart (and copied Plaintiff and Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart as well as the delays and costs caused by Defendant Lockhart's failure to turn them over to Tony Fernandes.

131.    On or about September 28, 2017, Defendant Lockhart responded that he had been out of town due to hurricanes and Defendant Lockhart asked if pickup of the remaining works could occur at the end of the following week. Plaintiff's assistant responded asking for a specific day for the collection of the remaining works.

132.    On or about October 4, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart.

133.    On or about October 10, 2017, Plaintiff's assistant followed up with Defendant Lockhart (and copied Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart.

134.    On or about October 10, 2017, Plaintiff's assistant reached out to Defendant Lockhart (and copied Plaintiff and Tony Fernandes) to arrange for pickup of the remaining works stored with Defendant Lockhart.

135.    On or about October 16, 2017, Defendant Lockhart responded to Plaintiff's assistant (and copied Plaintiff and Tony Fernandes) and apologized for his delay but stated that he was open for pickup of the remaining works on October 19, 2017.

136.    On or about October 16, 2017, Tony Fernandes responded to Defendant Lockhart and Plaintiff's assistant (and copied Plaintiff) and stated that Transcrate's partner Earth Relocations and their representative Samir Shah would set up the collection for October 19, 2017.

137.    On or about October 18, 2017, Tony Fernandes responded to Defendant Lockhart

and Plaintiff's assistant (and copied Plaintiff) and stated that Transcrate's partner Earth Relocations had tried contacting Defendant Lockhart but had not been able to reach him.

138.    On or about October 19, 2017, Plaintiff's assistant communicated with Defendant Lockhart (and copied Plaintiff and Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart (Tuppen, Theilker and Leblon). Tony Fernandes confirmed that Earth Relocations had received confirmation from Defendant Lockhart that he would send Earth Relocations the packing list and a collection time.

139.    On or about October 21, 2017, Tony Fernandes responded to Plaintiff's assistant (and copied Plaintiff) and stated that Earth Relocations would collect the remaining art pieces on October 24, 2017.

140.    On or about October 24, 2017, Tony Fernandes responded to Plaintiff's assistant (and copied Plaintiff) and stated that Transcrate's partner Earth Relocations was waiting to hear from Defendant Lockhart regarding the pick-up date.

141.    On or about October 31, 2017, Plaintiff's assistant followed up with Tony Fernandes (and copied Plaintiff) regarding the status of collecting the remaining works stored with Defendant Lockhart.

142.    On or about November 6, 2017, Plaintiff's assistant communicated with Defendant Lockhart (and copied Plaintiff and Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart and frustrations related to the delays.

143.    On or about November 13, 2017, Plaintiff's assistant followed up with Tony Fernandes (and copied Plaintiff) regarding the status of collecting the remaining works stored with Defendant Lockhart.

144.    On or about November 23, 2017, Plaintiff's assistant followed up with Defendant

Lockhart (and copied Plaintiff and Tony Fernandes) regarding the status of collecting the remaining works stored with Defendant Lockhart.

145.    On or about February 14, 2018, Defendants communicated with each other (copying Plaintiff's assistant) regarding the remaining non-shipped art pieces in response to Defendant Berklay's email that Berklay's warehouse was moving and that Plaintiff's stored works must be disposed of and auctioned:

> Your artwork was picked up, crated, and stored now for over 3 years.
>
> We need your immediate disposition, please.
>
> At this juncture, all charges for one shipment made in 2015, plus pickups, crating, and storage exceed $8000.00.
>
> If you do not have any need for this work, we will go to court as of MARCH 1, and claim these goods as ABANDONED.
>
> Then, we will auction off to obtain the fees owed, and if any excess, we will keep for your advice on how to distribute to the artists in question.
>
> Thank you for your understanding.
>
> *Best Regards,*
>
> *Dennis Klainberg*
> *President*

146.    On or about February 15, 2018, Defendant Berklay responded to Defendant Lockhart (and copied Plaintiff's assistant) and stated they were not aware of any lost items and that Defendant Lockhart should come to the warehouse to look at the inventory. Defendant Berklay stated they were moving in the next month and the issues related to pick up, crating, storage and shipment or turnover to another agent needed to be settled and that, "You Andrew [Defendant Lockhart] contracted with us to handle these matters."

147.    On or about February 15, 2018, Plaintiff's agent, Marzouq Al Ghanim, Managing

Director for Transcrate, emailed Defendants stating that it appeared Defendants had stolen Plaintiff's artwork because they were responsible for storing and shipping it to Plaintiff but are now refusing and/or claiming the artwork was lost. Plaintiff's assistant stated that Defendants appeared to be engaged in a scam and Plaintiff would proceed legally.

148.     On or about February 15, 2018, Defendants communicated with each other (copying Plaintiff's assistant and agent and Plaintiff) summarizing the situation and Defendant Lockhart asked Defendant Berklay to release the remaining works while Defendant Berklay invited Defendant Lockhart to come look for Plaintiff's (two missing) works at the warehouse.

149.     On or about May 14, 2018, Plaintiff learned that at least one of the Undelivered Art Pieces had been re-auctioned to the public. Jose Parla's Center Street, 2009-2010, which it appears was stored with Defendant Berklay, was re-sold by the auction house managed by Paddle8 in New York in 2017.

150.     On or about September 14, 2023, Plaintiff's Counsel received an email from Defendant Berklay that "All items deposited in our warehouse by Mr. Lockhart have been returned to Mr. Lockhart."

## VI.  CAUSES OF ACTION
### COUNT ONE: FRAUD

151.     Under New York law, the five elements of a fraud claim are: (1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997); *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.* 17 N.Y.3d 269, 276 (2011).

152.     Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendant Lockhart misrepresented on numerous occasions that he would purchase, acquire, store

and ship Plaintiff's Undelivered Art Pieces on her behalf and Defendant Berklay misrepresented on numerous occasions that it would properly and legitimately store and ship Plaintiff's Undelivered Art Pieces on her behalf. (*See* e.g., Paragraph 35 above, from Defendant Lockhart regarding Pryce Lee (Innocent Bystander): "the funds have arrived to my account and have since been transferred to the artist. . . we will be arranging the shipping in a few days once the work has been cleaned and proper crating has been secured. I will coordinate an email between you and the shipper at that time;" Paragraph 37 above from Defendant Lockhart: "Also, all of the other works here in the U.S will be rounded up this week and prepared for shipping. They are Pryce Lee - Innocent Bystander, Pryce Lee - Street Hieroglyphics, Michael Staniak, Daniel Arsham – Guitars, Murakami - Enso Painting, Kaws – Obliterate, James Austin Murray . . . I'll get you the estimates on all of these once they are all collected by the shipper on Tuesday and we can go from there;" Paragraph 86 above from Defendant Berklay: "Standing ready!" to ship artwork; and Paragraph 98 above from Defendant Lockhart: Lockhart was finalizing the shipment paperwork and that the works had been inventoried again). Defendants' misrepresentations were material because Plaintiff would not have paid for the Undelivered Art Pieces or their storage if she had known Defendants had no intention to deliver the artwork.

153.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendants were acting in concert by misrepresenting their intention to store and ship the Undelivered Art Pieces to Plaintiff. Defendant Lockhart blamed Defendant Berklay for failure to store and ship the artwork while Defendant Berklay pointed the finger at Defendant Lockhart for the delays. In addition, Defendants initially stated that all of Plaintiff's Undelivered Art Pieces were accounted for and ready for shipment, and then each blamed the other for losing the work and shipment delays. (*See e.g*., Paragraphs 65, 66, 72, 95, 100, 110, 113, 146-148 above). This

concerted behavior is the hallmark of a classic "shell game." Based on Defendants' prior relationship with each other, it appears Defendants were in regular communication regarding, and in the advancement of, the fraud alleged herein.

154.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendants knew these statements were false and that they did not intend to provide the Undelivered Art Pieces to Plaintiff.

155.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendants intended to defraud Plaintiff by taking her money without providing the Undelivered Art Pieces and/or by retaining the Undelivered Art Pieces.

156.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that based on their past successful dealings, Plaintiff reasonably relied on Defendant Lockhart's false statements to purchase, acquire, (and engage Defendant Berklay) to store and ship Plaintiff's Undelivered Art Pieces on her behalf and paid Defendant Lockhart $381,975.

157.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that based on Defendant Lockhart's relationship and past dealings with Defendant Berklay, Plaintiff reasonably relied on Defendant Berklay's agreement to store and ship Plaintiff's Undelivered Art Pieces on her behalf and permitted Defendant Berklay to take possession of the Undelivered Art Pieces for storage prior to its shipment of same.

158.    Plaintiff reasonably relied on Defendants' false statements and provided payments to and/or permitted Undelivered Art Pieces to be stored with Defendants based on Plaintiff's reliance.

159.    Defendants have failed to provide the Undelivered Art Pieces to Plaintiff.

160.    Plaintiff suffered damages in the loss of money and failure to receive the

Undelivered Art Pieces which have likely increased in value.

## COUNT TWO: FRAUD IN THE INDUCEMENT
## AND MISREPRESENTATION

161.    Fraud in the inducement and misrepresentation require that: (1) the defendants made a misrepresentation or material omission of fact; (2) the misrepresentation or omission induced the plaintiff to enter into a contract or purchase something from the defendants; (3) the defendants knew the misrepresentation to be false and intended to induce the plaintiff's reliance ("scienter"); (4) the plaintiff justifiably relied on the misrepresentation or omission; and (5) the misrepresentation or omission resulted in injury to the plaintiff. *Pappas v. Tzolis*, 20 N.Y.3d 228, 233 (2012).

162.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendant Lockhart misrepresented on numerous occasions that he would purchase, acquire, store and ship Plaintiff's Undelivered Art Pieces on her behalf and Defendant Berklay misrepresented on numerous occasions that it would store and ship Plaintiff's Undelivered Art Pieces on her behalf.

163.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that it appears that based on their prior relationship, Defendants were in communication with each other and acting in concert by misrepresenting their intention to store and ship the Undelivered Art Pieces to Plaintiff.

164.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendants knew these statements were misrepresentations and that they did not intend to provide the Undelivered Art Pieces to Plaintiff.

165.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that Defendants intended to defraud Plaintiff by inducing her reliance and taking her money without

providing the Undelivered Art Pieces and/or by retaining the Undelivered Art Pieces.

166.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that based on their past successful dealings, Plaintiff justifiably relied on Defendant Lockhart's statements to purchase, acquire, (and engage Defendant Berklay) to store and ship Plaintiff's Undelivered Art Pieces on her behalf and paid Defendant Lockhart $381,975.

167.    Plaintiff refers to and incorporates herein Paragraphs 19-150 and alleges that based on Defendant Lockhart's relationship with Defendant Berklay, Plaintiff justifiably relied on Defendant Berklay's agreement to store and ship Plaintiff's Undelivered Art Pieces on her behalf and permitted Defendant Berklay to take possession of the Undelivered Art Pieces for storage prior to its shipment of same.

168.    Plaintiff justifiably relied on Defendants' false statements and provided payments and/or permitted artwork to be stored with Defendants.

169.    Defendants have failed to ship the Undelivered Art Pieces to Plaintiff.

170.    Plaintiff suffered damages in the loss of money and failure to receive the Undelivered Art Pieces which have likely increased in value.

## VII.  CONDITIONS PRECEDENT

171.    All conditions precedent have been performed or have occurred.

## VIII.  JURY DEMAND

172.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

## IX.  PRAYER

173.    WHEREFORE, Plaintiff respectfully requests judgment, awarding damages in favor of Plaintiff in an amount to be determined at trial, but in no event less than $381,975, and/or

the production of the Undelivered Art Pieces, and for such other and further relief as the Court deems just and proper.

Dated: January 30, 2024

Respectfully submitted,

*/s/ Gregg N. Sofer*
Gregg N. Sofer
NY State Registration No. 2496933
TX State Bar No. 24126874
gregg.sofer@huschblackwell.com
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701
Tel: 512.472.5456
Fax: 512.479.1101

Georges Lederman
NY State Registration No. 2051662
georges.lederman@withersworldwide.com
WITHERS BERGMAN LLP
430 Park Avenue, 10th Floor
New York, NY 10022
Tel: 212.848.9863
Fax: 212.848.9888

ATTORNEYS FOR PLAINTIFF